IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,     :
                              :
v.                            :        CRIMINAL INDICTMENT NO.:
                              :        2:15-CR-00013-RWS-JCF
JAIME AGUIRRE-SANCHEZ         :

## ORDER and REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion To Suppress Evidence. (Doc. 19). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion be **DENIED**.

## Procedural History

A Superseding Indictment filed on May 5, 2015 charges Defendant with illegal re-entry after deportation, in violation of 8 U.S.C. § 1326(a) (Count One) and possession of a firearm by an alien illegally and unlawfully in the United States, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2) (Count Two). (Doc. 12). Defendant filed a motion to suppress evidence seized by law enforcement from his vehicle without a warrant on April 14, 2014. (Doc. 19). On August 14, 2015, the Court conducted a hearing on Defendant's motion (*see* Doc. 25), and a transcript[1] of that hearing was filed on August 26, 2015 (Doc. 26). Defendant filed a post-hearing brief on September 28, 2015 (Doc. 30), the Government submitted a

---

[1] References to that transcript will be designated as "Tr. __."

response on October 26, 2015 (Doc. 33), and Defendant replied on November 9, 2015 (Doc. 34). With briefing now complete, the undersigned considers the merits of Defendant's motion.

## Facts[2]

On April 14, 2014, Forsyth County Sheriff's Deputy Michael Ryan Hurst was on patrol when he received a call at 11:24 p.m. about a fight at 765 Sanders Road. (Tr. 4-7; Gov't Ex. 1). Deputy Hurst proceeded to that location, a single-story residence, arriving at approximately 11:30 p.m. (Tr. 7). He observed a van in the driveway. (*Id.*). He walked through the carport or garage[3] and knocked on a door to the house. (*Id.*). An individual identified as Ms. Ortiz opened the door and "immediately pointed to the back area of the house toward the back deck." (Tr. 7). Hurst entered the house and walked toward an open door leading to the back deck. (Tr. 7-8). He saw two Hispanic men on the deck, "both of them holding beer bottles." (Tr. 8). Hurst went onto the deck and saw a man, later identified as Mr. Hernandez-Calvo ("Hernandez"), with a 12-inch knife in his hand. (Tr. 8; *see also* Gov't Ex. 3). He also saw another man, later identified as Defendant, on the deck.

---

[2] These facts are taken from the testimony of Michael Ryan Hurst, a Deputy with the Forsyth County Sheriff's Office, Augusto Sesam (misidentified as "Seasm" in the transcript), a Lieutenant with the Forsyth County Sheriff's Office, and John Whitworth, a Sergeant with the Forsyth County Sheriff's Office, as well as exhibits admitted during the August 14, 2015 hearing (*see* Doc. 24).

[3] There was no door to the carport. (Tr. 22, 77).

(Tr. 8).  Defendant had multiple cuts on his chin, cheek, and one of his fingers[4]
(*see* Gov't Ex. 2), and he appeared to be intoxicated based on Hurst's observation
of watery, bloodshot eyes and the odor of alcohol "coming from his facial area."
(Tr. 13).  In light of the call that he had received and his observations, Deputy
Hurst believed that the two men had been fighting.  (Tr. 29).  Upon seeing the
knife, Deputy Hurst drew his weapon, pointed it at Hernandez, and repeatedly
commanded him, in English, to drop the knife.  (Tr. 8, 28).  Hernandez did not
respond to Hurst's commands, so Hurst realized he did not understand English.
(Tr. 8-9).  Hurst then repeated his commands in Spanish[5], and Hernandez put his
beer bottle and the knife down on the deck.  (Tr. 9).  Sergeant John Whitworth then
arrived, approximately two to three minutes after Hurst had arrived.  (Tr. 9, 76-78).
Deputy Krause also arrived on the scene.  (Tr. 10).

Hurst holstered his weapon and he and Sgt. Whitworth placed handcuffs on
Hernandez and two sets of handcuffs on Defendant, "so he would have a little bit
more room with his arms."  (Tr. 9, 30-32, 48, 79-80).  Since it was raining and
dark, the deputies moved the men inside to the kitchen area and patted them down.
(Tr. 7, 9, 32-33, 80).  Hurst tried to speak to the men but determined that neither of

---

[4] Deputy Hurst described the cuts as "minor" (Tr. 24), a description that is
supported by photographs of Defendant taken on the scene (*see* Gov't Ex. 2).
Defendant did not tell Deputy Hurst that he wanted medical attention, and when Lt.
Sesam later asked him if he wanted medical attention, he said no.  (Tr. 24, 61-62).
[5] Deputy Hurst does not speak Spanish and understands it "very little," but he had
learned enough Spanish to be able to tell Hernandez to put up his hands.  (Tr. 27).

them spoke English very well, so Lieutenant Augusto Sesam, who speaks Spanish fluently, was contacted to come to the scene to translate.[6]  (Tr. 10, 53, 55, 81). Hurst secured the knife, and Deputy Krause moved Hernandez to the garage or carport area, and Deputy Hurst escorted Defendant into the living room where he sat on the couch.  (Tr. 10-11, 32, 45, 80-81-82).

Lt. Sesam arrived at 11:55 p.m., spoke with the deputies who told him "they were trying to determine who was the aggressor" but could not speak with the men due to the language barrier, and then Sesam began to question Defendant.  (Tr. 11, 41-42, 54, 57, 65).  Sesam also believed that Defendant had been drinking because his "speech was a little bit slurred," but he "wasn't falling down drunk" or falling asleep.  (Tr. 60, 71).  Defendant told him that he "got in a fight, he lived there, but he didn't want to press any charges."  (Tr. 57).  Defendant did not appear reluctant to talk to Sesam, and he was willing to answer his questions.  (Tr. 69-70).  Sesam did not tell Defendant that he did not have to speak with Sesam, and he did not read Defendant his *Miranda* rights, i.e., the right to remain silent, to have a lawyer present, etc.  (Tr. 70).  Hurst remained in the kitchen area and observed Sesam speaking with Defendant off and on for approximately 30 minutes.  (Tr. 11, 49). Sesam spoke with Defendant in a normal tone and volume; he never struck Defendant, and no one displayed or pointed weapons at Defendant.  (Tr. 12, 22, 29,

---

[6] Like Deputy Hurst, Sgt. Whitworth also does not speak Spanish more than "a few simple words."  (Tr. 81).

4

59-60, 92).  Defendant was not told that he was under arrest at that point, accused of a crime, or threatened.  (Tr. 36, 60).

Lt. Sesam left Defendant periodically to speak with Hernandez, and Sesam told Deputy Hurst what the men were telling him.  (Tr. 12, 50, 57, 63).  Sesam was also under the impression that Hernandez was under the influence of alcohol because he stuttered and could not keep his balance.  (Tr. 65).  Hernandez told Sesam that Defendant had come to his house to try to sell him a rifle, Hernandez told him no, they went to the back porch, Defendant fired the rifle two times, Hernandez told him to stop, and Defendant pointed the rifle at him.  (Tr. 13, 57).  Hernandez told Sesam that he then retrieved a knife for self-defense, and the men fought.  (Tr. 14, 57).

Deputies Hurst and Krause searched the back deck for weapons to try to "back up one side of the story versus the other," but they were unable to find any weapons on the back deck or in the backyard.  (Tr. 14).  Lt. Sesam asked Defendant about the rifle, and he said there was no rifle, he did not have a rifle. (Tr. 58).  Lt. Sesam spoke with the woman who lived there (and who had called 9-1-1 about the fight), and she told him that Defendant did not live there and that she had never seen him before in the house.  (Tr. 58, 72-73).  Lt. Sesam again asked Defendant if he had any rifles, and he again denied it, so Sesam asked him, "Do you mind if we search your vehicle for the rifle?" and Defendant responded, "No,

go ahead." (Tr. 58). At 12:20 a.m., Lt. Sesam told Deputy Hurst and Sgt. Whitworth that Defendant had given his consent to search his van in the driveway. (Tr. 14, 42, 83).

Sgt. Whitworth then went to the driveway and searched Defendant's vehicle, which was unlocked, and he found three rifles. (Tr. 15, 62, 84-87). Whitworth removed the guns from the van and ran them through GCIC; one of the guns, a .22 Browning rifle, was reported as stolen out of Lumpkin County, Georgia. (Tr. 15, 87-88). At that time, Deputies Krause and Hurst "did a more thorough search of the back deck" and found a spent .22 shell casing on the right side of the deck where Defendant had been standing. (Tr. 15, 88). There was also a rifle case on the deck. (Tr. 64, 90). Hurst photographed the casing and collected it for evidence. (Tr. 16; *see also* Gov't Ex. 4). He also took photos of the rest of the scene, collected the evidence, including the knife, the shell casing, and the three guns (*see* Gov't Ex. 4), and at 1:29 a.m., he placed Defendant under arrest and transported him to jail. (Tr. 16, 21, 36, 44).

## Discussion

Defendant argues that "[t]he Court should suppress the guns and other evidence because [his] consent to search was the product of his illegally prolonged detention." (Doc. 30 at 4). He contends that once the deputies determined that he was not armed, they had neither reasonable suspicion that he had committed a

6

crime or exigency justifying his continued detention, and therefore, they "should have let him go long before they asked for his consent to search the van." (*Id.* at 5). The undersigned disagrees.

## I.   <u>Defendant's Detention</u>

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV.   "The 'ultimate touchstone of the Fourth Amendment is reasonableness.' " *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "Under *Terry v. Ohio*, 392 U.S. 1 . . . (1968), and its progeny, a police officer may briefly detain an individual if he has a reasonable and articulable suspicion that a person has committed or is about to commit a crime." *United States v. Williams*, 185 Fed. Appx. 866, 868 (11th Cir. 2006) (unpublished decision).   "In *Terry*, the Supreme Court 'carved out a narrow exception to the [Fourth Amendment] probable cause requirement, allowing police to detain a suspect based on reasonable suspicion for the purpose of an investigative detention.' " *Id.* at 868-69 (quoting *United States v. Hastomorir*, 881 F.2d 1551, 1556 (11th Cir. 1989)). "Reasonable suspicion is determined by the totality of the circumstances." *Id.* at 869.   "Further, officers may handcuff or otherwise restrain a suspect during an

investigatory stop when such action is reasonable under the circumstances to protect themselves or the public, or to maintain the status quo." *Id.*

"Under *Terry v. Ohio*, an officer's investigatory detention must be 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting *Terry*, 392 U.S. 1, 20 (1984)). "To determine the reasonableness of the investigatory detention, the court considers whether the events subsequent to the initial stop were reasonably related in scope to the circumstances which justified the stop." *United States v. Hernandez*, No. 1:12-CR-00322-AT-JFK, 2013 U.S. Dist. LEXIS 183203, at *27 (N.D. Ga. Aug. 12, 2013) (citing *United States v. Hardy*, 855 F.2d 753, 758 (11th Cir. 1988)), *adopted by* 2014 U.S. Dist. LEXIS 3479 (N.D. Ga. Jan. 13, 2014). To determine whether an investigative detention, "for which reasonable suspicion is enough," has ripened into "an arrest for which probable cause is required," the Court must consider "four non-exclusive factors." *United States v. Acosta*, 363 F.3d 1141, 1145-46 (11th Cir. 2004). "These factors are: the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *Id.* at 1146 (internal quotations omitted).

The undersigned finds that given the totality of the circumstances, the deputies had a reasonable suspicion that Defendant was involved in an altercation with Hernandez, and they acted reasonably in handcuffing Defendant and Hernandez while they investigated why the men were at the residence, what happened there before and during the altercation, and who was the aggressor in the altercation. They responded to a 9-1-1 call reporting a fight at a residence, and upon their arrival, they discovered two men on a deck late at night in the rain, both of whom were holding beers and appeared to be intoxicated, one of whom had a knife, and the other appeared to have been cut, possibly with the knife. The deputies acted reasonably in securing the men for the safety of the deputies, the other persons present at the house, and the men involved in the apparent altercation, while they investigated the situation. *See, e.g.*, *United States v. Clark*, 337 F.3d 1282, 1288 (11th Cir. 2003) (finding that officer acted reasonably in detaining the defendant who was present and an associate of two other men involved in a violent altercation because his "liberty interest was outweighed by the necessity for Officer Huff to control the movement of the three associates and to detain them briefly to ensure his safety while he conducted a criminal investigation"); *United States v. Fields*, 178 Fed. Appx. 890, 893-94 (11th Cir. 2006) (unpublished decision) (officer reasonably handcuffed the defendant and

placed him in a patrol car during a *Terry* stop to protect the officer and prevent escape).

Although Hernandez may have initially and superficially appeared to be the aggressor because he was holding the knife, the deputies were not required to act on that assumption rather than securing the men and the scene while they investigated what had actually happened, including the reasonable alternative scenarios that Defendant—who remained standing on the deck in the dark and the rain holding a beer in his hand with his purported attacker nearby—was the aggressor and Hernandez was defending himself or that the men had engaged in mutual combat.   "As the Supreme Court has recognized, a police officer performing his lawful duties may direct and control—to some extent—the movements and location of persons nearby, even persons that the office may have no reason to suspect of wrongdoing." *Hudson v. Hall*, 231 F.3d 1289, 1297 (11th Cir. 2000) (citing *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) and *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981)).

The testimony of the responding deputies highlights the reasonableness of the deputies' actions to "direct and control" Defendant's movements, given the uncertainties of the situation they faced.   Deputy Hurst explained that the men were handcuffed for officer safety while they investigated what was going on since they found a weapon at the scene and a fight in progress.   (Tr. 9-10).   They did not

know what threat Defendant might have posed, so they secured both men until they could determine whether anyone had any weapons on them and to investigate the fight.  (Tr. 29, 50).  Hurst was concerned that Defendant might have posed a danger to him, although his "primary concern was the gentleman with the knife." (Tr. 29).  Sgt. Whitworth explained that they handcuffed the men because it was an "active fight call" involving a knife, and they "really didn't know exactly to the extent what was happening, what had happened," so they secured them "to figure out what was going on.  For our safety we made sure no one else had weapons." (Tr. 80).  The undersigned finds that the deputies acted reasonably in handcuffing both men, taking them inside the house, and separating them during the ensuing investigation.

Moreover, due to the language barrier between the responding deputies and Defendant and Hernandez, the deputies could not question the men to investigate what had happened until Lt. Sesam arrived at 11:55.  This roughly 25 minute delay after the deputies initially arrived on the scene at approximately 11:30 (*see* Tr. 7, 42, 65; Gov't Ex. 1), is a reasonable amount of time to wait a translator to arrive. *See, e.g.*, *United States v. Mendoza*, 677 F.3d 822, 828 (8th Cir. 2012) (finding that it was not unreasonable to detain the defendant 20 to 25 minutes for a translator to respond to the scene); *United States v. Orta*, 228 Fed. Appx. 633, 634-35 (8th Cir. 2007) (unpublished decision) (finding that duration of stop was not unreasonable

where the trooper engaged in "diligent effort to dispel his suspicion, which was delayed due to a language barrier and the need for a translator"); *United States v. Gavilanas-Medrano*, No. 2:09CR00926 DS, 2010 U.S. Dist. LEXIS 102624, at *11-12 (D. Utah Sept. 28, 2010) ("Extension of the stop was also permissible to await the arrival of a Spanish speaking officer to assist in communications with Defendant." (collecting cases)), *aff'd* 2012 U.S. App. LEXIS 8006 (10th Cir. Utah Apr. 20, 2012).

Once Lt. Sesam arrived, he acted diligently in questioning the deputies, Defendant, Hernandez, and the occupant of the house who had called 9-1-1 about what had happened.  Upon talking to Hernandez, Sesam received information that Defendant had brandished and fired a rifle, justifying the deputies' continued detention of Defendant while they investigated that report by searching the location for evidence of those actions and asking Defendant to give his consent to search his vehicle, which he gave at 12:20 a.m., approximately 25 minutes after Lt. Sesam arrived.  (Tr. 14, 42).  A few minutes later Sgt. Whitworth discovered the rifles in Defendant's van.  (Tr. 42).  Thus, Defendant was detained for less than an hour from the time Deputy Hurst handcuffed him until Sgt Whitworth discovered the rifles in his vehicle, an amount of time that was not unreasonable given the need to have Lt. Sesam arrive to communicate with the men and the deputies' efforts to investigate the fight.  *See, e.g., Williams*, 185 Fed. Appx. at 869-70 (finding that

police reasonably detained defendant, including handcuffing him and placing him in a patrol car, for approximately one hour while they diligently investigated their reasonable suspicion that he was involved in reported shootings); *see also United States v. Gil*, 204 F.3d 1347, 1350-51 (11th Cir. 2000) (finding that officers reasonably detained the defendant in handcuffs in a patrol car for 75 minutes while they investigated her residence).

Accordingly, the undersigned finds that the deputies' detention of Defendant while they were investigating the apparent altercation between him and Hernandez was reasonable.  The undersigned now considers whether the Government has met its burden of demonstrating that Defendant voluntarily consented to the search of his vehicle.

## II.   <u>Consent To Search</u>

Where a seizure is made without a warrant, the burden is on the government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment."  *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).  The exception to the warrant requirement at issue here involves the seizure of evidence pursuant to an individual's consent.  "[L]aw enforcement officers may search an individual's property without a warrant, as long as the individual voluntarily consents to the search."  *United States v. Brumfield*, 352

Fed. Appx. 366, 367 (11th Cir. 2009) (unpublished decision) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219-22 (1973)).  "Whether consent is voluntary is a fact question determined according to the totality of the circumstances," *Brumfield*, 352 Fed. Appx. at 367 (quotation omitted), and the government bears the burden of proving the existence and voluntariness of the consent.  *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004).  The non-exclusive list of factors the court must consider in determining whether a consent was voluntary includes "[the] voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found."  *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984) (quoting *United States v. Phillips*, 664 F.2d 971, 1023-24 (5th Cir. Unit B 1981)); *see also United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996).  In *Gonzalez*, the Eleventh Circuit explained that "the absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that 'where there is coercion, there cannot be consent.' "  71 F.3d at 828 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)).

The undersigned finds that the Government has met its burden of demonstrating that Defendant voluntarily consented to the search of his vehicle.

The uncontradicted evidence shows that, although Defendant was handcuffed during the encounter, Lt. Sesam spoke with Defendant in a normal tone and volume; he never struck or threatened Defendant; and no one pointed a weapon at him.  (Tr. 12, 22, 29, 36, 59-60, 92).  Even though Defendant seemed to be under the influence of alcohol, Lt. Sesam testified that Defendant appeared to understand his questions and was able to respond appropriately to his questions.  (*See* Tr. 61). These circumstances are no more coercive than those found in other cases where the Eleventh Circuit held the consent to be voluntary.  In *United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993), for example, the court found defendant's consent to be voluntary even though he had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint," and "he had invoked his right to remain silent before consenting to the search."  *Id.* at 1571.  In *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989), the court found the defendant's post-arrest consent to search his residence was voluntary, even though fourteen agents were present when the defendant was arrested in his front yard; agents conducted a security sweep of his house; agents arrested him and led back into the house in handcuffs; and agents refused the defendant's conditional consent and requested to search the whole house "or else they would have to secure the house and apply for a search warrant."  *Id.* at 357-62 and n. 4.  Under the circumstances of this case, the undersigned finds that the

15

deputies did not coerce Defendant into consenting to the search of his van and that his consent was voluntarily given.

Because the deputies acted reasonably in detaining Defendant, and he voluntarily consented to the search of his van during that detention, it is **RECOMMENDED** that Defendant's motion to suppress evidence be **DENIED**.

### Summary

For the reasons discussed above, it is **RECOMMENDED** that Defendant's Motion To Suppress Evidence (Doc. 19) be **DENIED**.  It is further **ORDERED** that subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial**.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 23rd day of November, 2015.

 /s/ *J. CLAY FULLER*
J. CLAY FULLER
United States Magistrate Judge